Your Honor, the second case in the morning, call 2-08-0681, in re Marriage of Thornton. This is a consolidated case on behalf of the Avalanche, Mr. Michael Wyman, on behalf of the Avalanches, John Kincaid. Mr. Wyman. Good morning. Good morning. Please, the Court. My name is Michael Wyman. It's been my honor over the last five years to represent Peter J. Thornton, Jr. in disillusional marriage proceedings which have proceeded in the Circuit Court of DuPage County. I trust that the Court has had the opportunity to read all of the written briefs. This was a matter which involved, which should have been one of administrative convenience to the trial court, a binding and enforceable premarital agreement. As the trial court's April 30, 2008 written opinion reflects, the trial court spent 30 of its first 40 pages of its written decision methodically, decisively laying out the basis for the determination that the September 25, 2001 premarital agreement of Peter and Kai Young was valid and enforceable in accordance with Section 7 of the Uniform Premarital Act. The common law record decisively evidences truly the vexatious and vituperative claims that were brought by Kai Young to have this premarital agreement set aside throughout the pre-decree phase of this case. To summarize what the respondent in the underlying proceedings said to the Court were, I couldn't read the agreement. I had a straw man who was representing me that my husband found to be a lawyer. Peter made a side deal with me afterwards that vitiated and undermined the terms of our premarital agreement. I was nearly truly prevented and denied the right to even read my premarital agreement or understand what my husband's true financial condition was. I was coerced into signing and it was done under arrest. The lawyers did a bait and switch. They told me I was signing one agreement and then I signed another agreement. And in the end, I never even read the agreement. It was the admissions made by the respondent. After all of this incredible testimony that was presented to the Court as well as both of the underlying respected lawyers who prepared and put together this premarital agreement under appropriate circumstances and the corroborating testimony of Mr. Thornton, the Court appropriately upheld the premarital agreement. In Illinois law, the legislature has drafted the laws such that there is a presumption and the presumption was not rebutted in any way, shape, or form. How is it vexatious if the Court found that your claim in fact breached the agreement? Because I think the claims that went to the vexatiousness, Your Honor, all related to her claims that it was an invalid and unenforceable agreement. I think that's the secondary issue of once you've had a valid and enforceable agreement, had it somehow been breached. And the vexatiousness went to all of her claims that said this wasn't a valid and enforceable agreement. Be that as it may, to read the April 30, 2008 decision is like reading a mystery novel as I see it. You read the first 30 pages and you're expecting the Court has found this to be valid and enforceable. And once it finds it to be valid and enforceable, as a matter of law, the criteria which to follow in enforcing it are pretty clear and unambiguous. So the Court found that the agreement was valid and enforceable? Unequivocally. The Court found it was a breach, but not a material breach, correct? That is correct, Your Honor. Okay. And out of left field, though, after finding it to be a valid and enforceable, it imposed it different property division purposes. Under the Illinois Pre-Marital Agreement Act, the Uniform Act, prenuptials are allowed to control three principal issues in advance of parties getting married. The first is a determination as to what's going to be marital property. In this case, clearly, the parties exercised their right to override Section 503 of the Illinois Marriage and Dissolution of Marriage Act as set forth in my brief. Within the clear and unambiguous wording of the party's Pre-Marital Agreement Act, they said they are purposely disavowing the tenets of Section 503 and that they're not going to create marital property unless it be by affirmative action with title being put in both parties' names. The other two purposes which a pre-marital agreement can be used to effectuate are both satisfied here with the Thornton's pre-marital agreement. A, a determination as to alimony, maintenance, spousal support rights, and B, a guideline as to what's going to happen in the dissolution proceedings as it relates to property division, debt allocation, and attorney's fees. All three of these were the principal purpose that the Thorntons entered into a pre-marital agreement. So let me ask you, so the agreement is considered to be valid. If the trial court found, and we determined it was valid, there was a material, there was a breach by your client, doesn't that bear then on how, to what extent the agreement is enforceable? You can have a valid prenup, but if you have a breach of that, doesn't that bear on the analysis? To be frank, I don't believe so whatsoever because, A, the court found it wasn't a material breach and the evidence that was deduced at trial, evidence that there wasn't a breach. Ms. Thornton's, A, pre-marital agreement counsel, and B, the first lawyer who represented her in the dissolution proceedings said, I've had, the breach, I trust you understand, the breach went to the purported tendering of a quit-claim deed. Well, if you read the clear and unambiguous terms of the pre-marital agreement, that wasn't supposed to be effectuated until the first anniversary. So technically, the only time my client could have breached the agreement is after the first year the quit-claim deed had been tendered and given the right to be filed, and the testimony of Mr. Mammis was he, for a long time, long, long time, had held possession of the quit-claim deed but was never directed by his client to do anything with it, which was her affirmative action. Well, if you understand the trial court's rationale, then, following your logic, you found there was no material breach of giving the wife 100%, then, of the equity in the Quincy property. What was the rationale for the court doing that? None whatsoever, and that's the first basis of a reversible error, because clearly the pre-marital agreement says, A, she's getting a 50% interest in the property in consideration for her entering into the agreement, in addition to the marriage itself, and B, for a waiver of maintenance. So that's the reversible error on this issue, Your Honor, is that the court was bound by the terms of the contract that the parties had entered into on September 25, 2001, and all the players, even the trial court itself, in various different portions, acknowledges her expectation. The deal she made was she got 50% of his pre-marital and non-marital home in exchange for entering into the prenuptial agreement. So that's where I find the disjointed logic of the trial court. Once the court, A, found it to be valid and enforceable, which was required under the Pre-Marital Agreement Act, and B, set aside the affirmative defenses which were raised by Ms. Thornton, i.e., there was a material breach by my client which should set aside the agreement and allow the court to do things, it was bound by the agreement. It couldn't do anything more other than order 50-50. And if you look at the court's decision, on page 32, it says, this court has already found that the property was not of the class that was subject to a 50-50 division. And if you read the first 31 pages, which I have probably 30 or 40 times around, there is nowhere where the court finds that there was a class that it could have fit in where she could have, A, the court could have discretion under 503, and B, it could have done anything other than a 50-50 division. It flies in the face of Article 4 of the Pre-Marital Agreement Act, the pre-marital agreement, and no such finding can be found, and the trial court had no alternative but to order a 50-50 division. I know the trial court didn't say this, but if you look at the pre-marital agreement itself, it talks about, it could be construed as being ambiguous because it talks about receiving a 50% interest in the marital home by way of a quit-claim deed, and then it later says hereby does accept the equity in the marital home as opposed to saying the 50% share of the equity of the marital home. I mean, it basically says, that's what the respondents are arguing in their brief, that that language, that she's accepting the equity in the marital home is not limited to 50%, but is the entire equity, and apparently his attorney drafted this document, which is ambiguous, it's construed against him, correct? Well, I disagree because I think you have to read it within the context. As you've just put it forth, Your Honor, it's within the same sentence. Okay, the equity interest that she was getting was 50%, and you have to look at it in conjunction with the other parts of the agreement, which say that the parties agree that whatever eventually comes marital property, because as a matter of law, what this court, I'm sure, appreciates is that, A, under 503, this was my client's non-marital property. It was something he was coming into the marriage with, and he had never, by operation of her failure to do it, transferred it in. So either the court has to find it to be non-marital property, or employ the marital property provisions, which say marital property is going to be divided 50-50, which is what my client has acted in good faith, and by putting the funds in escrow, did. So I think the court has to read the agreement in the totality, which provides, A, within the same sentence, she's getting 50% of the equity, and B, all marital property was going to be divided 50-50. Was there evidence in the record as to when the Quitcoin deed was tendered to Mr. Mammis? Mr. Mammis testified that he had had the Quitclaim deed for several years. He was not able to testify as to when he specifically got it, but he recalled that within the year 2001, he had also received payment from my client. My client testified that he had tendered the Quitclaim deed at about the same time he had tendered the payment to Mr. Mammis, because the agreement that they had was that my client was going to pay the final bill that was due to Mr. Mammis for his fees and costs incurred. So you're saying there is evidence in the record that your client testified that he tendered the Quitclaim deed within the first year of the marriage? There is, Your Honor. Yes. Within the agreement, does it say that Mrs. Thornton had to order her attorney to file it? Nowhere, but also within the agreement, the only affirmative obligation my client had was to tender the Quitclaim deed. He had no duty to effectuate its filing with the reporter of deeds or take any affirmative action, and he satisfied that. And I look at that as kind of really a red herring in the fact that my client always operated under a proposition whereby he acknowledged she had 50 percent interest, this was the deal he had made with her, and he was going to abide by and live by the deal. So, as I note in my brief, he could have, technically, when realizing that the Quitclaim deed had not been filed by Mr. Mammis, won and disposed of the proceeds from the sale of his home in his individual name. He didn't do that. He put it in escrow after satisfying costs of sale. And second, Mr. Mammis was the first lawyer who was in the case for the first year it was pending. At any time there, he could have easily, because he had possession of it, filed the Quitclaim deed at any time. All right, so you're arguing that this agreement is valid, and the judge was right there, but because she did not order her attorney to file this, it's still his non-marital property? Absolutely not. What I'm saying is this, is that the trial court was correct in finding the agreement to be valid and enforceable. And at that point, it was a matter of law, the law of the case. The premarital agreement provided for a 50-50 division of the proceeds. The proceeds were put in escrow with court order and distributions being made to counsel. The remaining proceeds should have been divided 50-50, pursuant to the terms of the premarital agreement act. Judge Sotos didn't do that. He ordered retroactive to when the closing was. She got 100%. That's what I argue. Counsel, what about the maintenance issue? You're arguing that the trial court erred in awarding respondent rehabilitative maintenance. Right. As the court can see, Judge Sotos wanted Section 7B of the premarital agreement act, which is supposed to be used clearly, as the legislature intended, in very, very limited and extreme circumstances. The legislature did no way intended to create a loophole to say to spouses who enter into a premarital agreement, whereby there's a mutual waiver of maintenance, hey, you know what, this is a section you can come in no matter what. Even if you waive it premarital, postmarital, when you're getting divorced, you can come in. In fact, no. Well, in fact, you can come in no matter what. It may be considered inappropriate, but you can still make the request. And the request having been made, now the judge has to determine whether these unusual circumstances, unforeseeable circumstances exist, correct? I would agree, but that request was never made. If you read her closing argument, she didn't ask for any relief under 7B. 7B isn't mentioned whatsoever. And 7B is to be employed only where there's undue hardship in light of circumstances not reasonably foreseeable at the time the premarital agreement is at. We're mixing two different issues, though. It wasn't asked for. Correct. We find this a matter of law because it's not asked for. The court cannot, on its own, may still award the maintenance? No, I think that a trial court Could the trial court do that? I assume Spontae could, but I think it has to make findings that fit within the framework of 7B, that there has to be undue hardship in light of circumstances not reasonably foreseeable. Judge Sotos found that the unforeseeable circumstances were the emotional, the psychological and financial hardship that would befall Ms. Thornton after three years and three months of marriage for getting $150,000 of proceeds in exchange for a waiver of maintenance. 7B, Your Honor, is intended for situations unequivocally where you have a marriage that's 15, 20, long-term duration and the parties were young at the time they got married and healthy and they call for a bar of maintenance. And down the road, one of the spouses who's disadvantaged and has waived their maintenance rate suffers from some disability, disease, whereby if the court bars their maintenance and enforces the premarital agreement, they're going to be a public charge. They will have no ability to support themselves and it would go against public policy. Where do you lay this reading in 7B? I think it goes to the cases which are, the case, it's interesting that you ask that question because as the court I trust appreciates, the only case on point that interprets 7B is the 4th District case of Barnes and it's the only dispositive determination in 7B and reading into that, I think that's the support for it and the fact that there is no case law whatsoever that finds circumstances where 7B can apply. Barnes is the only case of record and in Barnes, the court upheld and reviewed the denial of relief under 7B. Counsel, you'd agree that this is a matter, 7B allows the discretion of the court. So the court having made this ruling, your burden would be, we would have to find that the court abunes its discretion, would we not? I respectfully disagree because it's a higher level. Well, a discretionary determination would be a 504 determination, the strict maintenance provisions. Here, no, there's a higher burden that's placed that has to be satisfied by the person seeking the maintenance, that they would have undue hardship based on circumstances not foreseeable at the time they entered the premium. Rather than making that point, part of the argument though was, you seem to be arguing that, well, the fact that she would have children is not unforeseeable, granted. However, didn't the trial court hinge in on the particular unusual obsession she seemed to have with the children, the emotional ties? Why can't undue hardship, you know, come into play under that category without necessarily being tied to financial hardship? Why is that impermissible? Biffy, because candidly, that is such a low burden because I'm sure that the gross majority of divorce litigants who are single parents going through a divorce can claim that same criteria. And if the burden's that low, it's created, open the floodgates. The loophole that's going to be created to premarital agreements that bar maintenance will be wide open. This is for very, very limited circumstances. And I understand what the trial court put down, but that doesn't rise to the level of setting aside a premarital agreement that clearly and unequivocally and freely and voluntarily incorporates a provision that the parties have waived maintenance and cannot seek any type of spousal support and maintenance. One final point, you know, you covered a lot of things. What is your take on the increase? The court said, used an intriguing phrase, we're not going to backdoor the maintenance, and yet all of a sudden it gets kicked up. So what's your argument on that issue? On the increase in the support? Right. That it was an abuse of discretion. A reading of the common law record shows that there was never any appropriate evidence introduced at trial as to what the respondent's true living expenses were. Local rule provides that a 1501 financial affidavit should be submitted by all litigants. There was none that was introduced. The evidence was weak. But I understand that the court can extrapolate and make deductions because provisions need to be made for minor children. I think by doing that and grossing it up to a figure that was in fact It went from what? It was a 6100, as I recall, to 8500? No, no, no. The parties had entered into a pre-decreed temporary support order for $2,800. In the judgment, the court finds that the total household living expenses were $6,100 per month, including the costs of Ms. Thornton, and reserved the issue looking for 2007 year-end financial information from my client, and then orders $8,500 a month in child support. The only deduction that this court can make by that is this. The judge found she needed $2,500 a month for maintenance. If you take that off of the 6100, the court found by deduction that she had for the children $3,600 a month in living expenses for the children. And then ordered a child support obligation that was 136% greater than that at $8,500 a month, on top of the $2,500 a month of backdoor maintenance that wasn't going to be backdoor maintenance. So, based on that, I think that the court abused its discretion as to amount and clearly breached the law as to retroactivity. And went back to the day my client filed, and 11 months before, she even sought temporary support and gave her maintenance, for which there is no statutory or case law authority. And as my final point, as it relates to the attorney's fees issues, clearly there was reversible error. Section 503J specifically says, within the portions of it, that the court must have a hearing on final fees after the close of proofs. That never happened. The court is to have and hold a separate and distinct contribution hearing where all the parties have the opportunities to be heard, and the lawyers are subject to examination. And furthermore, we would argue, as set forth in my brief, the court at the same time should have allowed us to have an evidentiary hearing on the pending petition for Supreme Court Rule 137 sanctions for going back to my claims that all of the fight that was raised as to the validity and enforceability of the premarital agreement was vexatious in nature. The statute doesn't say a distinct hearing. 503J? A distinct hearing? There's supposed to be a separate hearing. But it doesn't, you said it, separate and distinct. No, that's the case law that interprets it. All right. Yes, that is correct, Your Honor. Back on the maintenance, I understand that a party raising the issue under 7B has to show undue hardship in light of circumstances not reasonably foreseeable. But I just want to get back to our standard of review. I thought Barnes said that the standard of review in us reviewing a determination under 7B is an abuse of discretion standard. I don't have Barnes with me, but my recollection is that that's what the standard was. That is correct, Judge, and it's our argument that the discretion has to be based upon, though, an initial finding that there's undue hardship in light of circumstances that were not reasonably foreseeable. And I don't think that the court abuses discretion in, A, making a finding there was undue hardship, and, B, that having children and being emotional about a divorce are understandable. I just thought you had argued that it wasn't out of abuse of discretion standard. I just wanted to make sure I was correct in my thought about that. No, it's the secondary, that once, yes, the court abuses discretion. All right, thank you. Thank you. I appreciate your time. Counsel. May it please the Court. John Kincaid and George Frederick appearing on behalf of the Appellate E. Chi Young Court. If I could just review the posture of the cases. I understand at this point the case has been tried. We defer to the trial court to a large extent for finding of the facts unless those facts are against the manifest way of the evidence. We also have a standard under the 2005 case opinion written by Justice O'Malley of this court where he said that we really need to defer to the trial court unless, first, there's not only a finding of that the evidence is contrary to the manifest way of the evidence, but also that it's an abuse of the judge's discretion. So we have two hurdles to get over here if any relief is to be afforded by this court. We believe that Justice Judge Sotos acted painstakingly in this elongated trial that resulted in a 32-page opinion where he has set out for all of us his findings and the basis for it. This is not a short trial. This is a very long, complicated trial, and I believe that this court should defer to his findings. The arguments advanced, however, are that somehow Peter Thornton has been prejudiced by Judge Sotos' opinion. First, he argues that there was a premarital agreement in place, and then he is found to have breached that agreement. In the agreement, it says that the marriage, if it lasts for over one year, shall afford to Mrs. Thornton the equity in the marital home. He disputes that and says, no, she's only entitled to 50 percent of that. But in order to get 50 percent, he had an earlier responsibility to deliver a quit claim deed to his wife, giving that 50 percent. The court found that he had failed to do that and that he had breached the agreement. Counsel, that's a little perplexing because so far I think you're accurate in the record. But was it not true that the trial court found it was not a, quote, unquote, material breach? This is true. So if it's not a material breach, on what basis, then, does she end up with 100 percent, ignoring the plain language of the prenup? Well, on two bases, Your Honor. Number one, that's what the agreement says. If we read on, it says she's entitled to the equity after she's survived one year of marriage. But let me say, you've got to read it in the same sentence. You've heard his interpretation. I understand. I understand his interpretation. He drafted the agreement as to be construed against him. A divorce court is a court of equity. He comes into his court with unclean hands because he drafts an agreement, then he breaches it, but now he wants to use it to his advantage against his former wife. I don't think this court should permit that to happen. The other way she gets the $316,000 is because under the terms of the agreement, the only marital property to be split equally is marital property acquired after September of 2001. This property was acquired before because it was Peter Thornton's house that he should have conveyed one half of to his wife. So this property was not after acquired. It was acquired before. Sure, the form of the property was changed from bricks and mortar to a savings account, but Judge Sotos, in my opinion, had the authority under 503 to treat this as marital property that was not acquired after the marriage. And in so doing, he awarded that to Mrs. Thornton. Now, Peter wants to take that away, notwithstanding the fact that the agreement says that she should have the entire equity. And number two, the 503 gives the trial court the opportunity to divide marital assets as it sees fit. And I know we're not here to retry the case of the second judge, the second guest, Judge Sotos, but we're here to determine whether it reaches a level of abuse of discretion, which is a huge standard, and whether or not this finding by the judge is against the manifest weight of the evidence. So having then established the posture of the case, that we have a man who wants to enforce an agreement, doesn't abide by it, wants to interpret it his way, even though his attorney drew it, and we can all in this room read it to say that she's entitled to all the equity in the home. The issue of maintenance to Mrs. Thornton is a case that has not been visited by a lot of trial courts. Only the Barnes case is construed. And it does indicate, as Justice Burke has indicated, that, again, it's a high standard as to whether or not the trial court's opinion should be changed by the appellate court. And the Barnes opinion, at page 530 of 324 Illinois Appellate 3rd, says the issue of whether undue hardship existed as a result of circumstances not reasonably foreseeable at the time of the agreement was for the trial court to decide upon the evidence presented. We will not overturn the trial court's judgment unless it is contrary to the manifest weight of the evidence. On what specific basis? What did the court delineate as the hardship here that brings it within the purview of that decision? You know, we talked about that. He seemed to be suggesting it should be financial. I asked him if it could be other factors. So what is the particular hardship here to Mrs. Thornton? Well, there is undue hardship. And I realize there are two factors here, not only the hardship but also the unforeseen circumstances. I don't think that this woman could have foreseen that in September of 2001 she would have two children by this man. And I realize the court's comments earlier indicate that maybe a woman should anticipate that children will result from the marriage. I think that's an unforeseen circumstance. It could be used by Judge Sotos. And we all know that even if he – But part of that is unforeseen, that she would have two children? Yes. If she had 13 children, could she have unforeseen that? And would that have been something the court should have taken into consideration? And I realize the court didn't use those words, she couldn't have anticipated two children, but this court can affirm on any basis whatsoever and is not confined to the reasons set forth in the trial court record. But you asked with regard to what's the hardship, what's the burden. The hardship, as delineated by this court, is that this woman was having difficulty dealing with the issue of child raising because she was emotionally involved in, some people would say maybe over-emotionally, but I don't know how we can second-guess this woman who is obsessed with raising these children the way that she should. The judge felt that that was a hardship. This is not the court's basic finding. This was a doctor's finding who was involved in this case, correct? I believe that to be true, Your Honor. All right. So essentially Judge Sotos was adopting that particular position, professional representation. Yes. Did your client actually, other than challenging the agreement, was there ever a specific request for maintenance made under 7B? I mean, there are lots of petitions in this case that have been filed. Was there ever one that was filed with that language in it? Judge, I'm at a loss because I didn't try the case, and the record is voluminous, so I can't say one way or the other, but as we've said before in this courtroom, even if it's not in a petition, the court can use 7B, and I believe that's the purpose of 7B. I'm sorry. Well, counsel has said that there's just absolutely nothing in the record that indicates that there is a hardship, that there is an unreasonable, unforeseeable circumstance, or a reasonable unforeseeable circumstance, and yet as I look at Judge Sotos' decision, although a lot of it does talk about the validity of the agreement, there are multiple pages that just talk about Kai Young's background, her circumstances then, her circumstances now, and the doctor's report. So are we saying ultimately that the judge did look at all of this during the course, or is he responding to a petition, and that would be the question I'm asking. I'm assuming that he responded to the evidence, but, of course, he should be directed to certain statutes and a petition. And as to the issue of whether or not there was any proof on the child's report, as asked for and as awarded by the court, our brief page 19 sets forth pages in the record where the affidavit that Mr. Wyman said didn't exist, does exist, the record at C1032, she testified, that would be Kai Young at pages 2847 through 2851, and also beginning at 2873 for the better part of a day. So the evidence is there as to what her needs were, and I don't think, again, we should second-guess the judge of the trial court who, having watched these people testify, the hesitation, the manner of testifying is uniquely Judge Sotos'. And I believe that she has more than justified the award of $8,500 for child support. And if I could just... How does the court justify that, though, when the court says, I find that the reasonable expenses for the whole family, including Mrs., is $6,100 per month, and that I'm going to give you $8,500 for child support? How do we justify that vote? Well, looking back over the period of time, of course, the premarital agreement was signed in 2001. Then in 2004, we deal with the issue as to whether she needs support or not. The $6,100, in my opinion, was set to determine what her needs were at that time because Peter was taking care of a lot of the needs of the children at that time. Since the divorces occurred, he has not. So there's ample evidence, I believe, in the record as to why it should be $8,500 versus $6,100. But the $6,100, in my opinion, is the 2004-2005 numbers, whereas when he made his final decision on child support, it was only after he saw the tax return of 2007, that's Courts Exhibit No. 2 and Courts Exhibit No. 1, which was a pro forma statement as to Peter's income, which the court loaned for the first time that he could use to anchor a child support award, which he did the following September in 2008. But did the court specifically delineate why it raised the support from $6,100 to $8,500? I mean, was there specific factors that were cited other than it hadn't received all the tax information? I mean, what did the court say the reason was for kicking it up from $6,100 to $8,500? Or did it specifically say why it changed? I think we have to go back to those pages in the record where she did testify in the year of 2007 and 2008, whereas his finding of $6,100 related to the years of 2004 and 2005. But you're not aware, as you stand there, if in fact the court delineated the reasons? No, but it would be in his opinion if it does exist. I'm sorry, I can't cite that for you. On the issue of temporary support, what statutory basis is there to go all the way back to the filing of a divorce petition to give retroactive support? Right, and I believe there's an attempt here to confuse 501, which is what he used to readjust that temporary child support, with 510. Section 510 says it deals with post-decree efforts to modify support. That does say that a petition is the date upon which it relates to. There's no such reference in Section 501 to a filing date as being the determining factor. So in my opinion, Judge Sotos could go all the way back to the rift when the split occurred, when the separation occurred in 2004, and make that modification based upon his rights under Section 501, which is quite broad, which says the trial court at any time can modify either child support or maintenance on a temporary basis. Doesn't it also say that you set that temporary support to no detriment down the road? I mean, as far as a final judgment goes, I mean, I think that's the first paragraph of A of that, which says that you can't use this number down the road to either party's detriment. I mean, the trial court, when setting a final judgment and a final support order, isn't bound by any of this, you know, any temporary order. Well, I can only read Final 1 as saying that the court can make any adjustments to temporary support, and he did so, provided it's done before the entry of the final judgment. And it was entered before the final judgment. It was entered in September of 2008. As I understand it, he has the broad discretion to make that change. And your question is, of course, shouldn't the court consider all this in perspective of the final decision? Of course, he shouldn't. I believe that he did. I remember cases of this nature where the passage of time in and of itself, from the first day of the hearing to the last day of the order, is rather lengthy. And I think counsel stepped up and said he's been privileged for five years to represent Mr. Thornton. Does the court anywhere in references that he makes you say that you believe this is what he did? That he was using 2007 standards as opposed to 2002 or 2003 standards? Does he ever say that? And I'm looking at the decision, and I don't see that. But when he reserves current support pending this information, does he say anything about I'm concerned about the passage of time, I'm concerned about income and things of that nature? On a record, because it's not in the actual opinion order. Right. I can't cite a page to you where he might have done that, but it just makes sense. Plus the fact that counsel had never responded to the fact that his client no longer supports these children the way he did in those years of 2004 and 2005. So suddenly in 2007 and 2008, she's got the whole burden herself with the reason in and of itself to justify the $8,500, which is still what Judge Soto saw. He was paying extra expenses for the children. And, of course, even little Peter was probably not in soccer and those types of things in those days with extra. But there were doctors' expenses. Wasn't he paying the insurance for that? And isn't he today paying the insurance for that? Oh, good question. I don't know if he is today, Your Honor. I think he was at that time. Right. I guess the question, and then I'll ask counsel, then, what are those extra expenses he was paying? Sure. And I know my time is getting short here, and I did want to bring to the Court's attention because the Court did address it during counsel's argument, and that was the issue of attorney's fees and whether he should have had an evidentiary hearing. There's a case in the Second District which says that you could waive that hearing by not asking for the hearing. You've waived it. We cited that in our brief. And since the briefs were filed, with permission of the Court, I'd like to cite a case that was decided after that by the First District. That's San Frantangelo, 393 Illinois, Appellate 3rd, 641, where, again, no request was made under 503J for an evidentiary hearing, and the Court held that it had, in fact, been waived. And unless there are questions, I think my time might be up. Thank you, counsel. Thank you. Counsel, before you begin, if you could answer the question regarding the retroactivity of the temporary support and whether there are any cases that interpret that to allow for retroactivity. I know that your argument is brief, but I'd like you to respond to it. There's nothing whatsoever in the body of law in the state of Illinois in dissolution of marriage proceedings that allow any type of award in a dissolution proceeding back before the date of the filing of a petition to modify. That's clear and unambiguous under the law. And it's interesting you raise that issue, Your Honor, because the parentage laws are different, and there's a distinction that we can draw on in Illinois law. In parentage cases, under very special circumstances, you can go before the date of filing. Nowhere within the marriage act and dissolution cases does the Court have the authority to do that whatsoever. But a 510 modification customarily comes after a judgment is entered. That is correct, Your Honor. And a judgment has not been entered in this case. That is correct. So why are you applying 510 to this particular situation? Because there is no guidance under 501 whatsoever that says that under any circumstances can retroactivity be ordered whatsoever. Well, it doesn't say it can't, though. Well, it says within the subparagraphs that the Court always has the authority to modify or revoke the order. It doesn't in any way, shape, or form, nor is there any case law that interprets 501 that allows any type of retroactive award. Well, a revocation could go back to the beginning. I mean, the payment may have been made, but the revocation could go back to the beginning. No court of review in the Supreme Court has in any way ever said that. Well, I don't think it's ever happened. That may be the case. But under 501, I mean, people have a right to rely on the agreements that they make pre-decree and the temporary support because there is a marital estate, their parties have marital assets under their control. And the parties here, I turned into an agreement in December of 2005, just a month after, a year after the case was filed, and a month after she filed a petition for temporary support, she was going to get $2,800. And then, raising the other point that was raised in argument, if you go and look at the common law record, she brought a second petition for temporary support at the early part of 2007, and soup to nuts is what was covered, Your Honor. You made a point. Little Petey wasn't in soccer. Little Petey was in an immense amount of activities, tutoring, piano, extracurricular activities, lessons, which my client immediately agreed to and has to this day, because it's also part of the judgment, paid 100% of. And Judge Sotos really ignored that fact when he was making the findings of $3,600 and $6,100 because he didn't at all take into consideration that Peter was complying with the pre-decree order and that he subsequently also ordered him to pay 100% of those costs. Just briefly, in reply to what counsel stated, and I think the court can understand the circular argument, he said that the home is marital property that was not acquired after marriage. Well, there's no basis in law to find that marital property can be acquired before marriage. There was nothing at all, the parties weren't married, so marital property couldn't exist if it wasn't acquired after the marriage. My client was always operating in the good faith that by way and operation of the premarital agreement, the home became marital property to which they each had 50-50. He's never in any way, shape, or form acted in contrariance to that whatsoever. There's all kinds of cases that talk about property acquired in anticipation of marriage. You're absolutely correct that a marital homestead would do that. But my client had acquired that home in his first marriage. It's noted that he was awarded that home in his first divorce. That doesn't fall within the purview of the cases of a homestead being acquired in anticipation of marriage. But as they've been prepared to marry, that was the sticking point as I read the record, that if we're going to get married, I want to have some interest in this house. And it may have been cultural. It may have been just I'm your wife or I'm going to be your wife. I'm entitled to this. But the fact remains that her interest in that property, he gave her that interest in anticipation of their marriage, didn't he? It was the consideration because if you look at the testimony that was offered by our own lawyer, Mr. Mammis, he had, when the parties were negotiating this agreement back in 01, disseminated his own premarital agreement, which is distinguished from a premarital agreement because that's the title that was used here. And his had a schedule of step-up maintenance. If the parties weren't married X amount of years, she'd get this. And contemplated that it was his non-marital home. And, yes, she threw down the gauntlet and said, no, I'm not marrying you unless I get half the house. And he succumbed. And he gave it to her. The final agreement was drafted. And that's what she got. Briefly, with regards to the maintenance issues, you've asked some excellent questions. Was this an unforeseen circumstance? Well, you know, I view an unforeseen circumstance being something that is both unforeseen and beyond one's own control. I don't think anyone in the world had any control over the decision as to whether there were going to be two children other than the respondents. So to say it was an unforeseen circumstance just flies in the fact that this is the mother of the children, and she made a decision to have two children with my client. And she offers in the common law record that it was always their intention to have children as soon as they got this, based on their advanced ages. Finally, your Honor asked about a doctor's finding, and I want to distinguish that. Okay. The only doctor who was here wasn't really a doctor from an MD perspective. It was a 604B expert who had offered a custody evaluation here that came into the common law record under 604B. No time did, A, they make a request for the maintenance, but she never put her mental condition at issue. You know, when in a divorce proceeding you have a person putting their mental condition or their inability to earn income, there's two types of people come in. You're going to have 215A psychologist or psychiatrist or medical doctor who's going to come in and say, she can't work, she's not able to work, she's limited her vocational capacities. Or B, you see in a limited circumstance, vocational experts who will come in and say, she doesn't have the ability to work, that's why she needs maintenance. They never brought in any evidence like that. Well, I mean, I accept that those are the normal ways it happens, but this might make her, might make the award of maintenance even more plausible in that this is a court-ordered examination, supposed to be neutral in plain, and going in and looking at the parties and seeing what the circumstances are for the best interest of those children. And it appears, based upon the judge's citing of that doctor or psychologist probably, and then his own finding that work is likely in the future, but she's just not ready now because of the circumstances and her beliefs, whether, again, they're cultural, whether they're here, that she just can't go to work now. So that was a neutral, I mean, if we can call it that, in the she brought it up or he brought it up, this is a 604D, you know, we're trying to find out what's best for the children, and what's best for the children is to be at home with their mother for a period of two years, three years, and mother needs some income in order to accomplish that. How is that not an appropriate finding? Well, first of all, the burden is on Ms. Thornton to advance that theory. Well, if it gets proven by a neutral source, why should she make any other effort? Well, a neutral source made a tangential finding in this, and I think it's kind of taken out of context because it was going to the concerns that the 604B had, not about her ability to work. He never made any findings that she can't work or that she's limited or disabled in her capacity to work. He was more doing it within the purview of this is why I'm making my recommendations for visitation, custody, counseling, and the like. And I'm going to use the same argument that was used by opposing counsel. This was in 2006. When we went to trial in the later part of 2007, Ms. Thornton never said to the court, I don't have the ability to work, I can't go out, you know, because I don't think it's a bona fide basis in the 21st century for either a father or a mother to come before a court and say, I can't work because I'm the custodial parent or I have to stay home with my children. You know, the facts of life are that people have to go out. And the maintenance law, the body of law says both parties have a duty to support the children and both parties have a duty to be financially dependent. I thank the court for its time. Thank you very much. Thank you both counsel for your arguments. They were very informative. We will take this case under advisement.